THE TOWN OF LIBERTYVILLE, Plaintiff-Appellant, v. PATRICK CON-NORS *et al.*, Defendants-Appellees.

Second District No. 2—88—0831

Opinion filed July 7, 1989.

318

REINHARD, J., dissenting.

Charles J. Siemon, William D. McElyea, and James N. Azim III, all of Siemon, Larsen & Purdy, of Chicago (Gerald P. Callaghan, of counsel), for appellant.

Conzelman, Schultz, Snarski & Mullen, of Waukegan (Murray R. Conzelman, of counsel), for appellees.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

Pursuant to the Township Open Space Act (the Act) (Ill. Rev. Stat. 1985, ch. 139, par. 321 *et seq.*) plaintiff, Town of Libertyville (Libertyville), brought this condemnation action in the circuit court of Lake County against defendants, Patrick Connors, Cosmopolitan National Bank of Chicago, as trustee of trust No. 12398, and unknown owners. Libertyville sought to acquire the "future development rights" to two parcels of land owned by defendants and totaling 68.45 acres in size. The two parcels were separated by Guerin Road. Pursuant to section 2—619 of the Code of Civil Procedure (the Code) (Ill. Rev. Stat. 1985, ch. 110, par. 2—619), defendants filed a motion to dismiss, asserting that Libertyville lacked the authority to acquire an interest in the parcels. Following an evidentiary hearing, the trial court granted defendants' motion. This appeal followed.

The property in question consists of two parcels of land separated by Guerin Road. The parcel on the south side of Guerin Road equals approximately 40 acres and adjoins property on the south and west owned by the Lake County Forest Preserve District. The parcel on the north side of Guerin Road is approximately 28.45 acres. Defendant Patrick Connors and his wife have resided on the subject property for 33 years. Connors keeps horses on the property, and at the time of the hearing on defendants' motion to dismiss, he had 33 horses.

In connection with his horse operation Connors had two large barns, a tack room, two loafing sheds for protecting the horses in bad weather, two electric horse-walking operations, five outside pen-type stall buildings, 15 electric water tanks, several small paddock areas, and three major pasture areas on the parcel south of Guerin Road. The Connors' home was located on one acre of this southern parcel. The northern parcel of Connors' property consisted of one pasture with a paddock and a loafing-shed area. At the hearing, Connors presented photographs depicting the various facilities and equipment he

used in his horse operation.

Connors also put into evidence applications he had made in 1974, 1975, and 1976 to the county assessor for farm valuation of his property and the notices of the establishment of that valuation. Additionally, Connors presented evidence of applications he had made to the Lake County building department in 1965 and in 1970 for construction of barns and the receipts he received, indicating that each building permit pertained to buildings with a farm or agricultural exemption. Connors testified that since 1971, as indicated on the 1974 application for farm valuation, the property was exempt for farm use. Connors related that because of the farm exemption, his taxes on the property were based on a much lower rate than what he would have to pay if he did not have the exemption.

The evidence showed that Connors had extensive experience playing polo and that he trained most of his horses for polo. Those horses that were unsuitable for polo Connors sold as jumpers or pleasure horses. Connors testified that he did not advertise the sale of his horses in the telephone book, in periodicals, or with a sign. According to Connors, advertising would not generate any buyers because those who purchase polo ponies either return to the same seller with whom they have previously done business or contact one to whom they have been referred. Connors related that any local polo players knew him and knew he sold polo ponies. Connors stated that income he derived from his horse farm was strictly due to the sale of horses. That income amounted to $5,500 in 1983, $6,500 in 1984, $11,200 in 1985, and $12,000 in 1986. With the exception of 1985, Connors' expenses for maintenance of his horses during these years were greater than the income derived from the sale of horses. Connors presented no bills of sale, income tax returns, or other written records evidencing the sale of his horses.

Connors' testimony revealed that he is the sole owner of an insurance business which he operates out of his home. The business has salaried employees. Connors stated that he maintained separate bank accounts for his insurance business. Connors had no separate bank accounts for his horse operation and stated that he commingled any finances from that operation with his personal finances. Connors had no salaried employees for the horse operation. When asked if he utilized a business return to report to the Internal Revenue Service (IRS) the income from the sale of his horses, Connors invoked the fifth amendment privilege against self-incrimination. Connors also invoked the fifth amendment in refusing to answer how he reported to the IRS his expenses for the horse operation.

Libertyville tried to introduce into evidence a petition for annexation to Waukegan filed by Connors a few weeks before the hearing on Connors' motion to dismiss. Connors' objection to the petition was sustained. Later in the hearing, Libertyville introduced the petition by way of an offer of proof. The petition showed that Connors as petitioner described both the parcel north of Guerin Road and the parcel south of Guerin Road as contiguous to the City of Waukegan. When Connors presented his case, he referred to the annexation on direct examination and testified that the annexation allowed him to continue all operations he had pursued in the past on his property, including his horse operation. On cross-examination Connors admitted that both parcels were contiguous for annexation purposes.

Subsequent to the hearing on Connors' motion to dismiss, the trial court granted the motion, finding that the subject property, consisting of two parcels separated by Guerin Road, could not be considered as one area. According to the court, neither parcel, therefore, met the 50-acre requirement of the Act. (Ill. Rev. Stat. 1985, ch. 139, par. 322(b).) The court also found that the land owned by the Lake County Forest Preserve District adjacent to the parcel south of Guerin Road could not be used to compute the 50-acre minimum for that parcel. The court stated that if the acres of open land already acquired by Libertyville and lying adjacent to the parcel north of Guerin Road were added to Connors' northern parcel, the total acreage of the northern parcel would still be less than 50 acres.

Additionally, the court determined that Connors' property was exempt from acquisition by Libertyville because Connors' use of the land as a horse farm constituted a farming and agricultural use within the meaning of the Act. Ill. Rev. Stat. 1985, ch. 139, par. 324.02.

Libertyville appeals, contending that: (1) the trial court erred in finding that the Act requires Libertyville to acquire land in individual parcels of at least 50 acres; (2) the trial court's finding that Connors' property is devoted to farming or agricultural use and therefore exempt from condemnation was against the manifest weight of the evidence; and (3) Connors failed to meet his burden of proving that the subject property qualified for exemption from condemnation under the Act.

We first address Libertyville's contention that by bringing his motion to dismiss under section 2—619 of the Code, defendant Connors assumed the burden of proving that the subject property qualified for exemption from condemnation under the Act. Connors argues that the burden of proof was on Libertyville to show that it had the power to acquire Connors' land. Had Connors filed a traverse and mo-

tion to dismiss we would agree with his contention. When a traverse is filed challenging a condemnor's authority to condemn, the burden is on the condemnor to demonstrate its authority. (*Department of Public Works & Buildings v. Keller* (1975), 61 Ill. 2d 320, 324.) However, Connors filed only a motion to dismiss, and the party bringing a motion to dismiss has the burden of proving the affirmative matter which he asserts in that motion. (*Davis v. Keystone Printing Service, Inc.* (1982), 111 Ill. App. 3d 427, 434.) Therefore, it was Connors' burden to prove his property was exempt from condemnation.

 █ A motion brought pursuant to section 2—619 of the Code should only be granted if the affirmative matter asserted therein negates an alleged cause of action completely or refutes crucial conclusions of law or conclusions of material fact unsupported by allegations of specific fact contained in or inferred from the complaint. (*In re Estate of Bajonski* (1984), 129 Ill. App. 3d 361, 365.) In his motion to dismiss, Connors asserted that Libertyville did not have the authority to acquire the less-than-fee-simple interest in the subject property it sought because the property was not an area of land of 50 acres or more and because the property was used for farming or agricultural purposes. We believe Connors failed to establish that Libertyville did not have the authority to acquire his land.

 Under the Township Open Space Act, a township with an open-space program has the power to acquire a fee or any lesser interest in open land or open space by purchase, condemnation, or other means. (Ill. Rev. Stat. 1985, ch. 139, par. 324.02.) Section 2(b) of the Act defines "open land" or "open space" as "any space or area of land or water of an area of 50 acres or more" which meets certain open-space criteria. (Ill. Rev. Stat. 1985, ch. 139, par. 322(b).) Connors' property consisted of two parcels of land separated by a public road, Guerin Road. Connors presented evidence to show that each parcel was less than 50 acres in size. The parcel north of Guerin Road was approximately 28.45 acres and the parcel south of Guerin Road consisted of 40 acres. Thus, neither parcel alone met the 50-acre minimum of the Act.

 █ We have very recently determined in *Town of Libertyville v. Blecka* (1989), 180 Ill. App. 3d 677, that a landowner's property was subject to Libertyville's right of eminent domain if the landowner's land was a portion of a tract 50 acres or more being contemporaneously condemned by Libertyville or if the landowner's land abutted or adjoined a tract of 50 acres or more already owned by Libertyville. (See also *Town of Libertyville v. Ypma* (1989), 181 Ill. App. 3d 305.) In the instant case, the property south of Guerin Road ad-

joins open land of more than 50 acres, but this land is owned by the Lake County Forest Preserve District. The parcel to the north of Guerin Road abuts or borders upon a tract of open space already acquired by Libertyville. However, it is apparent from Libertyville's exhibit No. 8, which was a base map depicting, among other things, acquired open space, that the adjacent tract of open space was significantly smaller than Connors' northern parcel of 28.45 acres. Thus, the northern parcel was not adjacent to a 50-acre tract already owned by Libertyville. As neither the northern nor southern parcel of Connors' land abuts, adjoins, or lies adjacent to a tract 50 acres or more already owned by Libertyville, the individual parcels are not subject to Libertyville's right of eminent domain on this basis.

However, if each parcel is considered a portion of one tract of land of 50 or more acres, wherein all parcels are being contemporaneously condemned, then, under *Blecka*, both Connors' northern and southern parcels are subject to Libertyville's right of eminent domain. Libertyville contends that although Connors' property is separated by Guerin Road, the two parcels, which comprise 68.45 acres together, should be considered one tract.

In the instant case, defendant Connors treats the parcels in question as one area. Connors keeps horses on both parcels and moves them for pasturing and polo practice from one parcel to another across a narrow two-lane roadway. Additionally, equipment and facilities related to the general care of Connors' horses are located on both pieces of property. Connors operates his property as a unit and even refers to it as a unit, maintaining that his horse farm comprises both parcels. We find Connors' treatment of his property particularly significant in determining whether the property may be considered as one tract of land of 50 acres or more.

█ Libertyville points out that if individual parcels owned by a single owner cannot be separated in *any* way, the purpose of the Act and the types of programs the Act specifically authorizes would be defeated. "Open space," as defined in the Act, includes any area where the restriction of development would "enhance the value to the public of abutting or neighboring highways." (Ill. Rev. Stat. 1985, ch. 139, par. 322(b).) Listed among "open space purposes" is a preservation of "scenic roadways." (Ill. Rev. Stat. 1985, ch. 139, par. 322(d).) Here, Libertyville seeks the development rights to Connors' property on both sides of Guerin Road to preserve a scenic corridor along the road. Given the legislature's references to the existence of roads in conjunction with open lands, we believe such an acquisition, under the particular circumstances of the instant case, is authorized by the Act.

This decision, however, is limited to the facts of this case and should not be interpreted as allowing Libertyville to condemn individual parcels owned by a single owner which comprise less than 50 acres and which are separated by one or more parcels of land that have not been contemporaneously condemned or already acquired by Libertyville as open space.

This court's recent decision in *Egidi v. Town of Libertyville* (1989), 181 Ill. App. 3d 542, held that the Town of Libertyville did not have power to voluntarily purchase two tracts of land separated by a 270-foot strip of land owned by Commonwealth Edison because the separated parcels were each less than 50 acres. In *Egidi*, it is clear there was no contiguity between the parcels sought to be acquired because they were separated by the 270-foot parcel owned by Commonwealth Edison. There was no attempt to show they were other than noncontiguous separated parcels. Thus, the court there was able to distinguish the factual situation from those cases under the Illinois Municipal Code which have held that mere roadway easements do not destroy contiguity.

The case at hand is distinguishable from *Egidi* because all that separates the defendants' parcels in the instant case is the two-lane roadway. There is not a foreign ownership interposed.

■ In the law of municipal annexations, two parcels separated by a road, as in the instant case, could be considered contiguous, or connected, because of the common boundary of the road. (See *Spaulding School District No. 58 v. City of Waukegan* (1960), 18 Ill. 2d 526, 529.) The principles of contiguity from the law of municipal annexations would seem equally applicable in condemnation actions, especially in light of the fact the legislature has, by recent amendments to the Act, added the term "contiguous" to certain provisions (see, *e.g.*, Pub. Act 85—1140, eff. July 29, 1988 (amending Ill. Rev. Stat. 1985, ch. 139, par. 324.04(a)) and set forth that it shall have the same meaning as it does for purposes of annexation under the Illinois Municipal Code (Ill. Rev. Stat. 1987, ch. 24, par. 7—1—1). We can infer from this direction that if the definition of "open space" included the term "contiguous," that term would be interpreted in the same manner since a word which has a clearly defined meaning in one section of a statute ordinarily will be given the same meaning in another section of the same statute. *United Consumers Club, Inc. v. Attorney General* (1983), 119 Ill. App. 3d 701, 710.

■ We note that the record shows that Libertyville, by offer of proof, presented evidence in the form of a petition filed by Connors seeking to annex his property to the City of Waukegan. That petition,

signed by Connors under oath, describes the subject property and states that it is contiguous to Waukegan. Included in the description of the property is the portion of Connors' property lying south of Guerin Road. The trial court excluded this evidence and testimony related thereto. However, counsel for Connors during his case questioned Connors about the annexation and the permitted uses of property since the property's annexation to Waukegan. On cross-examination, Connors admitted that the parcels north and south of Guerin Road were contiguous for purposes of annexation. In light of our preceding conclusion that the principles of municipal annexations may apply to condemnation actions and the fact that Connors' counsel introduced testimony regarding the annexation, we believe the trial court erred in denying Libertyville's request to put the annexation petition into evidence. The petition represented further proof of the fact that the property north of Guerin Road and the property south of Guerin Road were considered as one tract by Connors.

We conclude that if the Act can be construed as applying the principles of the municipal annexation and requiring that parcels owned by a single owner and totaling 50 or more acres must be contiguous, or connected, to be considered open space, the subject property meets this requirement. Likewise, if contiguity of parcels is not required, the subject property, which, although separated by a two-lane road, is treated as one unit of land by its owner, constitutes an area of 50 acres or more of open space. Under either interpretation, the subject property meets the requirements of "open space" as set forth in the Act.

■■■ Having found that the subject property is a tract of 50 acres or more, we must next consider whether the property is exempt from condemnation because it is used for agricultural purposes. Section 4.01 of the Act allows a township to acquire property by condemnation "except where the real estate qualifies for additional valuation under Sections 20a—1 through 20a—3 of the 'Revenue Act of 1939' because of its use for farming or agricultural purposes." (Ill. Rev. Stat. 1985, ch. 139, par. 324.02.) Sections 20a—1 through 20a—3 of the Revenue Act of 1939 were repealed in 1983 (Pub. Act 83—347, eff. September 14, 1983 (repealing Ill. Rev. Stat. 1981, ch. 120, pars. 501a—1 through 501a—3)). But, statutes which adopt a particular provision of another statute by specific reference to the statute are unaffected by subsequent amendment or repeal of the incorporated provision; only the provision as it existed at the time of the adoption is incorporated into the adopting statute. (*North Shore Sanitary District v. Pollution Control Board* (1973), 55 Ill. 2d 101, 106; *Kloss v.*

*Suburban Cook County Tuberculosis Sanitarium District* (1949), 404 Ill. 87, 94.) Thus, despite the fact that the instant action was brought subsequent to the repeal of section 20a—1 of the Revenue Act of 1939, the criteria set forth in that provision for determining if the subject property qualifies for additional valuation because it is used for farming or agricultural purposes still apply.

■ The criteria set forth in section 20a—1 provided that property qualified as farming or agricultural land if it was (1) more than 10 acres in area; (2) devoted primarily to an agricultural use for the three years immediately preceding the year when an assessment of the property was made; and (3) so used with the "intention of securing substantial income." Connors contends that he operates a horse farm on the subject property and, therefore, uses his property for a farming or agricultural purpose with the intention of securing substantial income from farming activities. We believe the evidence presented by Connors at the hearing on his motion to dismiss was insufficient to prove this contention.

Connors has been raising, training, and riding horses on the subject property for many years. However, he did not establish that he had been doing these activities with an intention of securing substantial income. Rather, the evidence showed that although Connors kept approximately 30 horses on his property, he sold only one horse in 1983 for $5,500. For that same year he had expenses of $8,594.30. In 1984 he sold two horses for a total of $6,500 but had expenses of $6,567.47. In 1985 Connors sold two horses for a total of $11,200 with expenses of $9,406.83, and in 1986 he sold three horses for a total of $12,000 but had expenses of $16,735.06. In all, Connors had a net loss of more than $6,000 during 1983 to 1986.

By Connors' own admission these expense figures did not include taxes on the property used to raise and maintain the horses or the electricity used for the horse operation. Additionally, the expense figures were not recorded in any type of ledger. Instead, Connors' record of his expenses was based on the paid bills he had kept for 1983 through 1986. Connors presented no evidence to show that the aforementioned horse sales had occurred. He produced no bills of sale or other written financial records as proof of his purported horse business. Also, Connors admitted keeping no separate bank accounts, stating that the finances from his horse operation were commingled with his personal finances. When asked if he used a business return in reporting to the Internal Revenue Service the income he received from the sale of horses, Connors claimed the fifth amendment privilege against self-incrimination. Likewise, when asked how he reported

his expenses for the horse operation, *i.e.*, as business deductions, Connors again invoked the fifth amendment privilege.

Connors stated that he did not advertise the sale of his horses because those interested in purchasing polo ponies knew of Connors' operation. Libertyville presented evidence showing that other horse dealers advertised the sale of their polo ponies.

Connors testified that he employed no employees to help him with his horse "business," but, instead, rose early each morning to feed and ride his horses. In contrast, Connors had been in the insurance business for 17 years, maintaining an office in town until he moved his office to his residence located on the subject property. Connors maintained separate financial records for his insurance business and also had salaried employees.

■■■ ■ We do not believe that Connors established that he operated his horse business with the "intention of securing *substantial* income," as required by the Act. (Emphasis added.) The Act does not define what constitutes "substantial income." However, words used in a statute are to be given their ordinary and popularly understood meaning. (*Hernandez v. Fahner* (1985), 135 Ill. App. 3d 372, 381.) The ordinary meaning of "substantial" is "of ample or considerable amount, quantity, size, etc.: a substantial sum of money." (The Random House Dictionary of the English Language 1418 (1983).) Here, where it was shown that during a four-year period of time, Connors did not obtain a "considerable amount" of money from the sale of his horses but rather incurred a net loss of more than $6,000, we do not believe that Connors established that he ran his horse business with the "intention of securing substantial income."

■■ Our conclusion is substantiated by Federal tax cases which have interpreted the phrase "intention of securing substantial income." Since no Illinois cases, revenue statutes, or revenue regulations define what constitutes an "intention of securing substantial income" as set forth in section 20a—1 of the Revenue Act of 1939, we can look to these Federal decisions for help in interpreting this phrase. Where there is a lack of Illinois precedent, courts will consult the decisions of Federal courts. *People ex rel. Hartigan v. All American Aluminum & Construction Co.* (1988), 171 Ill. App. 3d 27, 34; *Fitzgerald v. Chicago Title & Trust Co.* (1977), 46 Ill. App. 3d 526, 528.

In *W. Jane Luce*, 70 T.C.M. 980 (P-H) (1970), petitioner maintained that she was in the business of breeding and training horses for sale and that any losses from her "business" could be claimed as deductions on her income tax return. However, as the court pointed

out, Luce's venture was run in a most "unbusinesslike" fashion. Among other things, she kept no records of her operation except for cancelled checks and some assorted bills. Although she professed to be breeding and training horses for sale, she sold only two horses, and no real efforts were made to sell other horses. The court stated that Luce was a champion rider who had taken a personal interest in horses for most of her life, training them and teaching others to ride. The court said:

> "She derived great pleasure and personal satisfaction from her activities, and while this fact does not prevent said activities from being pursued as a trade or business, it nevertheless indicates to some extent that training and breeding of horses may merely have been a continuation of her hobby." 70 T.C.M. (P-H) at 982.

The court concluded:

> "[T]he manner and conduct of the horse activities belie a genuine intent to make a profit. While she may have intended to sell some of her horses, we think this was only to defray the expenses of her hobby or to rid herself of horses which did not meet expectations. Her primary engagement was pursuing her life-long love and hobby of horses." 70 T.C.M. (P-H) at 983.

The facts in the instant case are similar to those in *W. Jane Luce*. Connors is an accomplished polo player who has been riding horses all of his life. He keeps more than 30 horses on his property, riding, feeding, and caring for them but sells, on the average, two horses per year. He keeps no records of his operation other than paid bill receipts for his expenses and makes no efforts to advertise the sale of his horses despite the fact he operates his business at a loss. Further, Connors, like the petitioner in *W. Jane Luce*, pursued another business besides raising and training horses. We think it evident from these facts that Connors pursues his horse operation as a hobby and not with the intention of securing substantial income.

In *Monfore v. United States*, 77 T.C.M. (CCH) 86, 496 (1977), the petitioners, a physician with a full-time medical practice and his wife, alleged that they intended to produce income from vacation island property they owned in Canada. Among the factors considered by the court in finding that the petitioners lacked the true intent to profit from the use of their property as a commercial resort was the petitioners' failure to keep written records of income or expenses for the property. The court also considered the fact that petitioners commingled funds for the property with their personal account and with Dr. Monfore's medical office account. Although the property was operated

at a continuous loss, the petitioners made no attempt at formal advertising and took no action to convert losses into profits.

These factors are also present in the instant case and further indicate not only that Connors had no intention of securing substantial income from his horse operation but also that his operation cannot be considered the primary use of the property. The primary use of Connors' property was as a residence, and the horse activities carried on by Connors were primarily for his own recreation and pleasure rather than as a business enterprise.

■■■ In an attempt to show that the subject property was devoted primarily to an agricultural use, Connors put into evidence applications he filed with the Lake County Supervisor of Assessment for farm valuation of the subject property and notices of that valuation. However, as Libertyville points out, these assessments are irrelevant to the present action because they pertain to the years from 1971 to 1976. Connors put forth no evidence regarding the number of horses he kept on his property during those years or the amount of income earned from selling or training horses during that period. Consequently, a determination cannot be made concerning whether his activities from 1971 to 1976 were identical to those in 1986, when the condemnation action was brought, in terms of showing the "intention of securing substantial income" that was needed to obtain a farm valuation for the property. We note also that the notices of farm valuation allegedly issued by the county assessor do not identify the signer of the notices or identify the issuing body.

Also, the receipts Connors put into evidence from the Lake County Building Department, showing a farm exemption for certain farm buildings to be constructed on the subject property, are equally irrelevant. The receipts, dated 1965 and 1970, were issued prior to the time sections 20a—1 through 20a—3 were added in 1971 to the Revenue Act of 1939. Thus, these receipts cannot constitute proof that the subject property at the time of the issuance of the receipts met the criteria set forth in section 20a—1.

We conclude that Connors failed to meet his burden of proving that his property is used with the intention of securing substantial income from his horse activities.

■■■ Having found that Connors has failed to prove that his property is used for farming or agricultural purposes, we need not consider Libertyville's argument that the conservation easement, or less-than-fee interest, Libertyville wishes to acquire in the property cannot qualify for exemption from the Act because the property constitutes farm or agricultural land. A conservation right is a property interest

distinguishable from the underlying fee (see Ill. Rev. Stat. 1985, ch. 30, par. 401) which the legislature may give a condemning body the right to acquire. (*Department of Public Works & Buildings v. Keller* (1975), 61 Ill. 2d 320, 324; *City of Crystal Lake v. LaSalle National Bank* (1984), 121 Ill. App. 3d 346, 353.) In section 4.02 of the Act, the legislature has given a township the right to acquire by condemnation a less-than-fee interest in real property that is open land. (Ill. Rev. Stat. 1985, ch. 139, par. 324.02.) As defendant Connors failed to disprove at the hearing on his motion to dismiss that the subject property is open land, Libertyville has the authority under the Act to acquire a conservation easement in the property.

Accordingly, the judgment of the circuit court of Lake County granting Connors' motion to dismiss is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

LINDBERG J., concurs.

JUSTICE REINHARD, dissenting:

In *Egidi v. Town of Libertyville* (1989), 181 Ill. App. 3d 542, 537 N.E.2d 369, this court considered an issue quite similar to that present in this case: whether two parcels, each less than 50 acres but when added together equal more than 50 acres, separated by a 270-foot right-of-way could be acquired under the Township Open Space Act (Act) (Ill. Rev. Stat. 1987, ch. 139, par. 321 *et seq.*). We held that, because the separate areas of land purchased did not adjoin or abut each other, the two parcels cannot be considered "an area of land" within the statutory definition contained in section 2(b) of the Act. (*Egidi*, 181 Ill. App. 3d at 545, 537 N.E.2d at 372.) The majority's attempt to distinguish factually *Egidi* from the case at bar is not convincing. The court in *Egidi* further determined that "[t]he fact that these parcels would be considered contiguous under certain provisions of the Illinois Municipal Code [citation] is of no relevance here," a holding which is also not followed in the majority opinion. (See *Egidi*, 181 Ill. App. 3d at 545, 537 N.E.2d at 372.) While the majority cites a recent amendment to section 4.02 of the Act which sets forth that "contiguous" shall mean contiguous for purposes of annexation under article 7 of the Illinois Municipal Code, the amendment was neither in effect at the time of the commencement of this condemnation suit, nor is that definition applicable to section 2(b) of the Act, but is expressly limited to the purposes of section 4.02 of the Act. Accordingly,

the Town of Libertyville failed to establish that it sought to acquire an area of 50 acres or more within the meaning of section 2(b), and the circuit court correctly dismissed the suit.

One final note. This court has heard appeals in a series of cases in which the Town of Libertyville has sought to acquire land under the Open Space Act (see, *e.g.*, *Town of Libertyville v. Ypma* (1989), 181 Ill. App. 3d 305, 536 N.E.2d 1275; *Town of Libertyville v. Blecka* (1989), 180 Ill. App. 3d 677, 536 N.E.2d 1271; *Herbes v. Graham* (1989), 180 Ill. App. 3d 692, 536 N.E.2d 164; *Town of Libertyville v. First National Bank* (1988), 178 Ill. App. 3d 591, 533 N.E.2d 54), and our decisions have not always been consistent (compare *Town of Libertyville v. First National Bank* (1988), 178 Ill. App. 3d 591, 533 N.E.2d 54 with *Town of Libertyville v. Blecka* (1989), 180 Ill. App. 3d 677, 536 N.E.2d 1271), which is further illustrated by the majority decision in this case and the decision in *Egidi*. Perhaps the issues raised in these cases are ripe for resolution by our supreme court as, in all candor, the interpretation of the Open Space Act and its constitutionality should be reexamined.